# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| MICHAEL WAYNE RODGERS, | : | CIVIL ACTION NO. |
| Plaintiff, | : | 3:15-CV-1449 (JCH) |
| | : | |
| v. | : | |
| | : | |
| CAROLYN W. COLVIN, | : | August 17, 2016 |
| COMMISSIONER OF SOCIAL | : | |
| SECURITY, | : | |
| Defendant. | : | |

## RULING RE: CROSS MOTIONS TO REVERSE (DOC. NO. 22) AND AFFIRM (DOC. NO. 23) THE DECISION OF THE COMMISSIONER OF SOCIAL SECURITY

## I.   INTRODUCTION

Plaintiff Michael Wayne Rodgers ("Rodgers") filed this administrative appeal pursuant to section 405(g) of title 42 of the United States Code.[1]  See Complaint ("Compl.") (Doc. No. 1) at 1.  Rodgers seeks an Order reversing the final decision of the Commissioner of Social Security, defendant Carolyn W. Colvin ("Colvin"), which denied Rodgers's applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") benefits for an alleged disability that began in 2011.  See Plaintiff's Memorandum of Law ("Pl.'s Mem.") (Doc. No. 22-1) at 1.  Colvin has filed a

---

[1] Under the Social Security Act, a State agency generally performs the initial disability determination.  See 42 U.S.C. § 421(a)(1).  A claimant dissatisfied with a determination can request a hearing by the Commissioner of Social Security.  See 42 U.S.C. § 421(d).  The Commissioner "is directed to make findings of fact, and decisions as to the rights of any individual applying for a payment under [the Act]."  42 U.S.C. § 405(b)(1).  The Commissioner's authority to make such findings and decisions is delegated to administrative law judges ("ALJs").  See 20 C.F.R. §§ 404.929 et seq.  A claimant can appeal an ALJ's decision to the Social Security Appeals Council.  See 20 C.F.R. §§ 404.967 et seq.  If the appeals council declines review or affirms the ALJ opinion, the claimant may appeal to the appropriate United States district court.  See 42 U.S.C. § 405(g).  "The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  Id.

cross-Motion in which she asks the court to affirm that final decision.  See Defendant's Motion for Order Affirming Decision of Commissioner ("Mot. to Affirm") (Doc. No. 23).

The first issue presented is whether the Administrative Law Judge, ALJ Tanya J. Garrian ("ALJ Garrian"), properly developed the administrative record ("Record") with respect to Rodgers's mental and psychological difficulties.  The second issue presented is whether ALJ Garrian afforded proper weight to the opinion of Rodgers's psychiatrist.

For the reasons that follow, the court **GRANTS** Rodgers's Motion to Reverse (Doc. No. 22), **DENIES** Colvin's Motion to Affirm (Doc. No. 23), and **REMANDS** this case to the agency for proceedings consistent with this Ruling.

## II.    FACTS[2]

Rodgers was born in 1970.  See Certified Transcript of the Record ("Tr.") (Docs. No. 12-3 through 12-9) at 18.  In school, Rodgers received special education services because of learning disabilities and Attention Deficit Hyperactivity Disorder ("ADHD").  See Id. at 1001.  He has worked in various careers throughout his life.  See Id. at 212.  He has also suffered serious physical ailments.  See, e.g., id. at 383, 660.

Rodgers reported that he received a bipolar disorder diagnosis in his twenties.  See id. at 1010.  Rodgers also reported that he received treatment for depression.  See id. at 566.  In 2009, Rodgers visited Dr. Syed Gilani, M.D. ("Dr. Gilani") with problems including anxiety, which medication was helping him manage.  See id. at 846.  In 2010, Dr. Gilani renewed Rodgers's anxiety medication.  See Id. at 830–31.  In November 2011, Rodgers reported anxiety and racing thoughts on a psychological evaluation.

---

[2] This section describes the relevant facts based on the parties' stipulation.  See Plaintiff's Proposed Stipulation of Facts ("Stipulation") (Doc. No. 22-2) at 1–19; Defendant's Memorandum ("Def.'s Mem.") (Doc. No. 23-1) at 2 (agreeing to Stipulation and adding certain facts).

<u>See</u> <u>id.</u> at 566.  He received a Global Assessment of Functioning ("GAF") score of 58.

<u>See</u> <u>id.</u> at 566.  Rodgers was prescribed depression and anxiety medication.  <u>See</u> <u>id.</u> at 994.

Beginning in late 2011, Rodgers received addiction and mental health treatment at Natchaug Hospital's Care Plus program ("Care Plus").[3]  <u>See</u> <u>id.</u> at 260–61.  Care Plus medical records are not in the Record.  <u>See</u> Plaintiff's Proposed Stipulation of Facts ("Stipulation") (Doc. No. 22-2) at 6.  In 2012, a Social Security Administration ("SSA") worker generated a report on Rodgers that showed trouble answering questions, concentrating, and sitting still.  <u>See</u> <u>Tr.</u> at 239.

In early 2013, Rodgers was homeless and sometimes stayed with his mother.  <u>Id.</u> at 248.  At this point, Rodgers reported having bipolar disorder, depression, and Post Traumatic Stress Disorder ("PTSD").  <u>Id.</u> at 255.  Rodgers wrote that he had trouble focusing and remembering his medicine.  <u>See</u> <u>id.</u> at 249.  Rodgers also reported difficulty socializing, <u>see</u> <u>id.</u> at 253; understanding instructions, <u>see</u> <u>id.</u> at 254; and adapting to changes, <u>see</u> <u>id.</u> at 254.  Rodgers was attending regular Care Plus meetings to maintain sobriety.  <u>Id.</u> at 253.  In March 2013, Rodgers began treatment at the Community Mental Health Affiliates.  <u>See</u> <u>id.</u> at 1031.  Rodgers reported a history of bipolar disorder and depression.  <u>See</u> <u>id.</u> at 1031.  A May 2013 examination indicated Rodgers had impaired attention and concentration.  <u>See</u> <u>id.</u> at 1012.  On June 4, 2013, Rodgers reported feeling somewhat better.  <u>See</u> <u>id.</u> at 1083.

---

[3] Rodgers appears to have had some affiliation with Care Plus until 2013:  The stipulation states that Rodgers received treatment at Care Plus from late 2011 to early 2012.  Stipulation at 6 (citing <u>Tr.</u> at 260–61).  The cited portion of the Record, however, shows that Rodgers reported at some point in February or March 2013 that his last Care Plus appointment was in February 2013 and that his next would occur in March 2013.  <u>See</u> Tr. at 261.  The Reply cites this same portion of the Record to say that Rodgers received treatment at Care Plus "into 2013."  Reply at 1.

On June 18, 2013, psychiatrist Dr. Margaret Chaplin, M.D. ("Dr. Chaplin")

evaluated Rodgers for the first time.  See id. at 1073.  The Record contains Rodgers's

treatment records from Dr. Chaplin, continuing to May 22, 2014.  See id. at 331.

Medical records from the time Rodgers spent under Dr. Chaplin's care indicate memory

difficulties, see id. at 1142; trouble concentrating, see, e.g., id. at 1135, 1142; racing

thoughts, see id. at 1057; anger, see id. at 1071, 1165; mood swings, see, e.g., id. at

1057, 1169; depression, see id. at 322, 1165; anxiety and panic attacks, see, e.g, id. at

1142, 1146–47; flashbacks, see id. at 283, 331; and daytime sedation, see id. at 1045.

The medical records also indicate that, on some occasions, Rodgers seemed to

improve with regard to one or another of his symptoms.  See, e.g., id at 1135, 1165.

While under Dr. Chaplin's care, Rodgers received GAF scores of 48, see id. at 1060;

and 45, see id. at 1153.

## III.   PROCEDURAL HISTORY

### A.        Initial Applications

On May 15, 2012, Rodgers filed DIB and SSI applications for an alleged disability

that began on March 1, 2011.  Id. at 9.  On September 28, 2012, the SSA denied his

claims.  See id. at 9.  On January 15, 2013, the SSA denied his reconsideration request.

See id. at 9.  In February or March 2013, Rodgers submitted an SSA "Disability Report:

Appeal" form, which noted that he had been receiving mental health treatment at Care

Plus since 2011.[4]  See id. at 259–61.  On February 28, 2013, Rodgers filed a hearing

request.  See id. at 9.

---

[4] While the form is undated, Rodgers states that his most recent visit was in February 2013 and
that his next appointment would occur in March 2013.  See Tr. at 261.

4

B.         Treating Psychiatrist Opinion

In July 2014, Dr. Chaplin submitted a Mental Medical Source Statement of Ability to do Work-Related Activities ("Dr. Chaplin Opinion").  See id. at 1279–1283.  Dr. Chaplin noted that Rodgers had "marked" limitations in his abilities to understand, remember, follow simple instructions, and make simple judgments.  See id. at 1279. She noted that Rodgers has trouble retaining information, remembering appointments, and staying on task.  See id. at 1279.  Dr. Chaplin also noted "marked" social difficulties, and "constant" problems with concentration, persistence or pace.  See id. at 1280.  Dr. Chaplin wrote that Rodgers is "too impaired to work," even on good days.  See id. at 1282.

C.         ALJ Hearing

On August 7, 2014, Rodgers appeared with counsel for a hearing before ALJ Garrian.  See Tr. at 26, 29.  At the hearing, the ALJ asked a vocational expert, Larry Takki ("Takki"), to assume that an individual could perform work at a medium level, as long as the work fell within certain physical constraints, which the ALJ described, and involved only "simple, routine, repetitive" tasks with only "occasional superficial contact with the public, coworkers, and supervisors."  Id. at 59.  Takki stated that such an individual could not perform any of Rodgers's past work.  Id. at 59.  Takki stated, however, that other work exists for such an individual, and he detailed such work.  Id. at 59–60.  The ALJ then asked the vocational expert whether work would exist for an individual with the limitations the ALJ had just described, if the individual also had "moderately-severe limitations in the ability to respond appropriately to customary work

5

pressures and to maintain appropriate persistence and pace." Id. at 60. Takki stated

that such additional limitations "would preclude all work." Id. at 60.

    D.        ALJ Decision

    On August 29, 2014, ALJ Garrian issued a decision denying benefits. See id. at

9, 19. ALJ Garrian applied the SSA's five-step disability analysis.[5] See id. at 10–13. At

step one, ALJ Garrian found that Rodgers had not performed substantial gainful activity

since the alleged onset date. See id. at 11. At step two, ALJ Garrian found that

Rodgers had "severe impairments," including physical problems and bipolar disorder.

See id. at 11. At step three, the ALJ found that Rodgers's impairments did not equal

any on the SSA Listing of Impairments. See id. at 12.

    At step four, ALJ Garrian found that Rodgers had "the residual functional

capacity to perform medium work as defined in 20 C.F.R. §§ 404.1567(c) and

416.967(c) except" that Rodgers should perform only work meeting certain physical

constraints which the ALJ described, should do only "simple, routine, repetitive" tasks,

and should have only "occasional, superficial contact with the public, co-workers, and

supervisors." Id. at 13. Part of the ALJ's residual functional capacity ("RFC")

determination rested on her finding that Rodgers was not credible, id. at 14; and her

conclusion that Rodgers suffered from at most a "moderate" mental limitation, id. at 17.

ALJ Garrian stated:

> In terms of the claimant's alleged mental impairments, the
> objective medical evidence and the claimant's treatment

---

[5] An ALJ follows a five-step process to determine disability: (1) The ALJ considers whether the
claimant is currently engaged in substantial gainful activity; (2) if not, the ALJ considers whether the
claimant has a "severe impairment" which limits his ability to do basic work activities; (3) if so, the ALJ
asks whether the claimant has an impairment listed in Appendix One of the Social Security regulations;
(4) if not, the ALJ asks whether the claimant has the RFC to perform his past work; and (5) if not, the ALJ
determines whether other work exists for the claimant. 20 C.F.R. § 416.920(a)(4).

history do not support his allegations of disabling symptoms. Despite the claimant's allegations of flashbacks, difficulty concentrating, emotional difficulties, and an inability to maintain tasks, the claimant's treatment records actually show that he responded quite well to mental health treatment. Prior to early 2013, the claimant engaged in very little documented mental health treatment. The claimant complained of depression and anxiety in November 2011, with his treating provider assigning him a [GAF] score of 58. However, this examination also noted no problems with attention, concentration or memory despite his subjective complaints. After November 2011, the claimant does not engage in any significant mental health treatment until early 2013. Between early 2013 and mid-2014, the claimant's GAF scores do decrease from 52 to 48; however, the claimant's treatment notes actually indicate an improvement in his symptoms during this period. In May 2013, the claimant's mental status examination outlined impaired concentration and attention but by July the claimant reported that his medication worked well to control his symptoms. The claimant reported an increase in his symptoms, including reduced concentration and increased anxiety, in September 2013. However, this increase in his symptoms appeared to be related to his relationship with his new girlfriend. Between October and December 2013, the claimant reported feeling good with medication managing his moods.

Id. at 15–16 (citations omitted). The ALJ found that Rodgers had at most moderate difficulties in daily living, social functioning, and concentration, persistence, and pace; and had not had any extended periods of decompensation. Id. at 16–17. ALJ Garrian found little support for the allegation that Rodgers suffers flashbacks, visual hallucinations, and emotional difficulties. Id. at 17.

The ALJ found that Rodgers's treatment records provided "little support" for the Dr. Chaplin Opinion. Id. at 16. ALJ Garrian stated that Dr. Chaplin's description of marked social problems and constant concentration, persistence, and pace difficulties was "not supported by the overall weight of the evidence of the record, which shows

improvement in the claimant's symptoms with medication and generally normal mental status examinations."  Id. at 16.

Based on Rodgers's RFC, ALJ Garrian concluded that Rodgers is unable to perform any of his past work.  Id. at 17.  At step five, however, the ALJ concluded that other jobs exist in significant numbers in the national economy that Rodgers can perform.  Id. at 18.  ALJ Garrian thus concluded that Rodgers is "not disabled."  Id. at 19.

On October 9, 2015, the SAA Appeals Council denied Rodgers's review request, making the ALJ decision the SSA's final decision.  See Tr. at 1.  This appeal followed.

## IV.   LEGAL STANDARD

Social Security benefits are payable to a claimant with a "disability."  42 U.S.C. § 423(a)(1)(E).  A disability includes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment" which lasts at least a year.  42 U.S.C. § 423(d)(1).  To be disabled, an individual's impairment must be "of such severity that he is not only unable to do his previous work but cannot . . . engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

"A district court reviewing a final . . . decision [of the SSA] pursuant to section 205(g) of the Social Security Act, 42 U.S.§ 405(g), is performing an appellate function."  Zambrana v. Califano, 651 F.2d 842, 844 (2d Cir. 1981).  "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, [are] conclusive."  42 U.S.C. § 405(g).  Accordingly, the court may not make a de novo determination of whether a claimant is disabled.  See Wagner v. Sec'y of Health &

Human Servs., 906 F.2d 856, 860 (2d Cir. 1990).  Rather, the court's function is to ascertain whether the Commissioner applied the correct legal principles in reaching her conclusion, and whether the decision is supported by substantial evidence.  See Johnson v. Bowen, 817 F.2d 983, 985 (2d Cir. 1987).

## V.    DISCUSSION

### A.          Record Development

Rodgers first argues that the ALJ failed to fully develop the Record.  See Pl.'s Mem. at 1.  Rodgers argues that ALJ Garrian should have (1) obtained his Care Plus medical records, see id. at 4; (2) followed the SSA's special mental impairment review technique, see id. at 3; (3) arranged for a State case review, see id. at 3; and (4) ordered a consultative examination, see id. at 4.  For the reasons discussed below, the court agrees that ALJ Garrian should have obtained Rodgers's Care Plus medical records.  The court finds that failure to obtain these medical records was significant. With respect to the mental impairment review technique, the court finds no error.  The court holds that the SSA should reconsider its exercise of discretion as to whether to arrange for a State case review or a consultative examination once the SSA obtains the Care Plus medical records.  Because failure to obtain the Care Plus medical records amounts to failure to fully develop the Record, the case is remanded to the ALJ to obtain said medical records and for reconsideration.

"Because a hearing on disability benefits is a non-adversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record.  This duty exists even when the claimant is represented by counsel."  Perez v. Chater, 77 F.3d 41, 47 (2d Cir. 1996) (citation omitted).  Courts in this Circuit have stated, however,

9

that, "[w]hen an unsuccessful claimant files a civil action on the ground of inadequate development of the record, the issue is whether the missing evidence is significant." E.g., Stevenson v. Colvin, No. 3:14CV965 (WIG), 2015 WL 9437888, at *6 (D. Conn. July 21, 2015), report and recommendation adopted, No. 3:14-CV-00965 (VAB), 2015 WL 9450817 (D. Conn. Dec. 23, 2015) (internal quotation marks omitted).  As a general rule, "the burden of showing that an error is harmful normally falls upon the party attacking the agency's determination."  Shinseki v. Sanders, 556 U.S. 396, 409 (2009).

1.      Care Plus Records

Rodgers argues that his Care Plus medical records, which the SSA failed to obtain, were necessary to complete the Record.  See id. at 4.  The court agrees.  Before determining an individual is not disabled, the SSA "shall develop a complete medical history of at least the preceding twelve months."  42 U.S.C. § 423(d)(5)(B).  In a subsection titled "Our responsibility," the Social Security regulations elaborate:

> Before we make a determination that you are not disabled, we
> will develop your complete medical history for at least the 12
> months preceding the month in which you file your application
> . . . unless you say that your disability began less than 12
> months before you filed your application.

20 C.F.R. §§ 416.912(d); 404.1512(d).  Complete medical history means "the records of your medical source(s) covering at least the 12 months preceding the month in which you file your application."  20 C.F.R. §§ 416.912(d)(2); 404.1512(d)(2).  Medical sources include all "health care providers."  20 C.F.R. § 404.1502.

Rodgers filed his applications in May 2012 for an alleged disability beginning in March 2011.  See Tr. at 9.  Colvin thus had an obligation to develop Rodgers's complete medical history from at least May 2011.  Rodgers's complete medical history

10

during this period would have included the records of his Care Plus treatment, which begin in 2011 and continued until 2012 and then 2013.  See Stipulation at 6; Tr. at 260–61.  "The ALJ's duty to develop the administrative record encompasses [ ] the duty to obtain a claimant's medical records."  Brown v. Comm'r of Soc. Sec., 709 F. Supp. 2d 248, 256 (S.D.N.Y. 2010).  Brown thus stated that, while it was unnecessary for an ALJ to obtain certain medical records that fell outside the 12-month period before application, "[t]he ALJ's actions likely would not have been sufficient had the records at issue dated from the 12-month period prior to the application date."  Brown, 709 F. Supp. 2d at 257.  The Second Circuit found one ALJ's effort to develop the administrative record sufficient because the ALJ requested records from a source and had no way to know that the records received in response were incomplete.  Drake v. Astrue, 443 F. App'x 653, 656 (2d Cir. 2011).  Drake thus implies that the ALJ must at least request records from each medical source.  Colvin has not alleged, let alone demonstrated, that the ALJ requested records from Care Plus.

The duty to obtain medical records extends to all of a claimant's multiple medical sources:  Where an administrative record contained medical records from only one of a claimant's two physicians, a court in this Circuit held that the ALJ was obligated to either obtain, or instruct the claimant to obtain, medical records from the other physician.  See Hughes v. Apfel, 992 F. Supp. 243, 247 (W.D.N.Y. 1997).  Similarly, the Second Circuit found that an ALJ failed to adequately develop the administrative record where the claimant was receiving treatment at two hospitals, but the ALJ sought medical records from only one.  Atkinson v. Barnhart, 87 F. App'x 766, 768 (2d Cir. 2004).  The fact that

the Record here contains medical records from Dr. Chaplin thus does not excuse the absence of the Care Plus records.

The regulations have a subsection titled "Your responsibility," which states:  "You must inform us about or submit all evidence known to you that relates to whether or not you are . . . disabled. . . .  If we ask you, you must inform us about: (1) Your medical source(s)."  20 C.F.R. §§ 416.912(c); 404.1512(c).  In response to an SSA form's instructions to, "[t]ell us who may have medical records or other information about your illnesses, injuries, or conditions since you last completed a disability report," Rodgers listed his Care Plus mental health treatment.  See Tr. at 260–61.  To list Care Plus in this context should have informed the SSA that Care Plus medical records would constitute evidence.  A claimant may bring the existence of medical records to the SSA's attention without explicitly stating that said medical records exist and without providing said medical records:  The Tenth Circuit has held that a claimant's submission of physician billing records, along with his statement that the physician had diagnosed him, served to bring the existence of medical records to the ALJ's attention, and thus to obligate the ALJ to obtain medical records from that physician.  See Lee v. Barnhart, 117 F. App'x 674, 679–680 (10th Cir. 2004).  With respect to the Care Plus medical records, Rodgers met his responsibility to inform the SSA of evidence.

Colvin argues that, "it was reasonable for the ALJ to assume that the record was complete" when Rodgers and his attorney (1) failed to produce the Care Plus medical records in response to the SSA's request for all relevant medical records, (2) declined to object to the admission of exhibits even though the exhibits lacked the Care Plus records, and (3) failed to ask the SSA to subpoena the Care Plus records.  See

Defendant's Memorandum ("Def.'s Mem.") (Doc. No. 23-1) at 7.  Rodgers's failure to produce the Care Plus medical records in response to the SSA's request for all relevant medical records cannot excuse the ALJ's failure to obtain these records.  "The fact that the ALJ requested additional information from the Plaintiff's attorney and did not receive that information does not relieve the ALJ of his duty to fully develop the record." Newsome v. Astrue, 817 F. Supp. 2d 111, 137 (E.D.N.Y. 2011).  The SSA may sometimes discharge a narrow duty to obtain a particular piece of information by asking the claimant for that piece of information specifically.  See generally Rivera v. Comm'r of Soc. Sec., 728 F. Supp. 2d 297, 330 (S.D.N.Y. 2010) (collecting cases).  It would be unreasonable, however, to allow the SSA's blanket request for all relevant medical records to excuse the SSA from its entire "responsibility" to develop the claimant's "complete medical history."  See 20 C.F.R. §§ 416.912(d); 404.1512(d).  In some situations, an ALJ's duty to obtain a medical record may end once the claimant declares the administrative record complete.  See Streeter v. Comm'r of Soc. Sec., No. 5:07-CV-858, 2011 WL 1576959, at *4 (N.D.N.Y. Apr. 26, 2011) (finding that ALJ adequately developed administrative record where "the ALJ specifically asked Plaintiff's counsel, during the hearing, if the medical records were complete, to which Plaintiff's counsel responded affirmatively" and where administrative record already met regulatory requirements).  Here, however, Colvin has not alleged that Rodgers's counsel declared the Record complete.  See Def.'s Mem. at 7.  Rather, counsel simply declined to object to the admission of proposed exhibits.  See Tr. at 29.  Colvin seems to suggest that, even after a claimant informs the SSA that he received treatment from a certain source, the claimant's failure to notice that the administrative record lacks medical records from

13

said source relieves the SSA of its duty to obtain such medical records.  The court

cannot agree with such a proposition, which would require claimants to check the SSA's

work.

Rodgers cites what he considers a "clearly erroneous" finding by the ALJ in

support of his argument that the ALJ should have obtained his Care Plus records.  See

Reply (Doc. No. 24) at 1.  The disputed finding is ALJ Garrian's conclusion that, "'[p]rior

to early 2013, the claimant engaged in very little documented mental health treatment.'"

See Pl.'s Mem. at 3 (citing Tr. at 15–16).  According to Rodgers, said conclusion made

Rodgers's Care Plus health records necessary to complete the Record.  See Pl.'s Mem.

at 4.  The court agrees.  An ALJ's finding that a claimant received insufficient treatment

to substantiate a disability may trigger additional administrative record development

obligations:  For instance, the Second Circuit found an ALJ's failure to seek a medical

record from one treating source "particularly glaring" where the ALJ "based his

conclusion that plaintiff did not have a serious mental impairment on" his belief that the

claimant had not received treatment for such an impairment.  See Atkinson, 87 F. App'x

at 768.  Similarly, the Tenth Circuit held that an ALJ who based a decision on a

claimant's lack of medical treatment was obligated to develop the record by

investigating the claimant's explanation for lack of treatment.  See Lee, 117 F. App'x at

679.  A court in this Circuit has held that an ALJ was obligated to seek certain medical

records due to his indication that the absence of such medical records impacted his

ability to evaluate medical source opinions.  Rivera v. Colvin, No. 11CIV7469-LTS-DF,

2014 WL 3732317, at *31 (S.D.N.Y. July 28, 2014).  Here, the fact that ALJ Garrian

based her decision partly on a finding of very little pre-2013 mental health treatment

further obligated ALJ Garrian to develop the Record by obtaining medical records of the pre-2013 mental health treatment that Rodgers listed.

Failure to obtain the Care Plus records was significant for two reasons.  See Stevenson, 2015 WL 9437888, at *6.  First, the Care Plus records might show that Rodgers had more than "very little" pre-2013 mental health treatment, thus removing one basis for the ALJ's reasoning.  Second, the ALJ discredited the Dr. Chaplin Opinion partly due to the ALJ's impression that Rodgers had improved with medication.  See id. at 16.  If the Care Plus records were to reveal a pattern of periodically improving and regressing, such medical records might change the ALJ's decision to discredit Dr. Chaplin.

### 2.      Mental Impairment Evaluation

Rodgers argues that the SSA failed to apply the required mental impairment evaluation technique.  See Pl.'s Mem. at 3.  The court finds that the SSA substantially followed the required technique, and that Rodgers was not harmed by any technical departure.  See Shinseki, 556 U.S. at 409.

"Social Security Regulations require the ALJ to use a 'special technique' to evaluate the claimed mental impairments."  Avila v. Astrue, 933 F. Supp. 2d 640, 651 (S.D.N.Y. 2013); see also 20 C.F.R. §§ 404.1520a(a), 416.920a(a).  The technique involves the following steps:  First, the SSA makes findings regarding the signs that reveal a medically determinable mental impairment.  See 20 C.F.R. §§ 404.1520a(b)(1), 416.920a(b)(1).  Second, the SSA rates the degree of limitation that the impairment causes in "four broad functional areas . . . :  Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of

decompensation," See 20 C.F.R. §§ 404.1520a(b)–(c), 416.920a(b)–(c).  Third, the

SSA determines whether the mental impairment is "severe."  See 20 C.F.R. §§

404.1520a(d), 416.920a(d).  Fourth, if "severe," the SSA determines whether the

impairment meets or equals in severity a listed mental disorder.  See 20 C.F.R. §§

404.1520a(d)(2), 416.920a(d)(2).  Fifth, if the mental impairment neither meets nor

equals any listing, the SSA evaluates the claimant's RFC.  See 20 C.F.R. §§

404.1520a(d)(3), 416.920a(d)(3).  The SSA must "document application of the

technique in the decision."  20 C.F.R. §§ 404.1520a(e), 416.920a(e).  The regulations,

however, do not require the decision to explicitly mention the technique.

At the hearing level, the ALJ substantially performed the mental impairment

review technique.  The ALJ hearing decision,

> must incorporate the pertinent findings and conclusions based
> on the technique. The decision must show the significant
> history, including examination and laboratory findings, and the
> functional limitations that were considered in reaching a
> conclusion about the severity of the mental impairment(s).
> The decision must include a specific finding as to the degree
> of limitation in each of the functional areas.

20 C.F.R. §§ 404.1520a(e)(4), 416.920a(e)(4).  With regard to the first step, ALJ

Garrian discussed the evidence pertaining to Rodgers's mental impairment, see Tr. at

15–17; but did not explicitly specify which evidence ALJ Garrian found to substantiate

the existence of such an impairment.  Failure to explain why ALJ Garrian found Rodgers

to have a mental impairment did not harm Rodgers, however, because ALJ Garrian did

find that Rodgers had the mental impairment of bipolar disorder.  See id. at 11.  ALJ

Garrian fulfilled the second step when she found that Rodgers had at most moderate

difficulties in daily living activities, social functioning, and concentration, persistence,

and pace; and did not experience any extended decompensation.  See id. at 16–17.

ALJ Garrian fulfilled the third step when she found that Rodgers's bipolar disorder

constituted a severe impairment.  See id. at 11.  While ALJ Garrian did not explain her

reasoning at this third step, the lack of explanation did not harm Rodgers because ALJ

Garrian found the impairment severe.  The ALJ fulfilled the fourth step when she found

that none of Rodgers's impairments equaled a listed impairment.  See id. at 12.  The

ALJ fulfilled the fifth step when she determined Rodgers's RFC, which included mental

limitations.  See id. at 13.

Social Security regulations state that, "when we evaluate the severity of mental

impairments . . . we must follow [the] special technique at each level in the

administrative review process."   20 C.F.R. §§ 404.1520a(a), 416.920a(a).  Rodgers

argues in his Reply that "[t]he ALJ effectively conceded in her decision that the

Commissioner did not apply the psychiatric technique . . . at earlier levels in the

administrative review process as required."  Reply at 2 (citing Tr. at 17).  Rodgers

presumably refers to the ALJ's statement that the "record does not contain an

assessment of the claimant's functional limitations from a state agency psychological

consultant."  Tr. at 17.  Social Security regulations only require use of the special

technique, however, "when we evaluate the severity of mental impairments."  See 20

C.F.R. §§ 404.1520a(a), 416.920a(a).  Rodgers does not state whether his initial

applications alleged mental impairment.  Documents in the Record suggest that

Rodgers's initial applications alleged only physical problems.  See, e.g., Tr. at 66, 224

(listing left eye blindness, diabetes, spine problems, sciatica, restless leg syndrome,

sleep apnea, and hepatitis).  Rodgers thus has not demonstrated that the SSA had reason to apply the special technique at the initial application stage.

### 3.      State Case Review

Rodgers suggests that the ALJ failed to fully develop the Record by failing to obtain a psychological review of Rodgers's case from the State agency that decided Rodgers's initial application.  See Pl.'s Mem. at 3 ("[T]he absence of a state case review in the record . . . constitutes reversible error.").  The court holds that ALJ Garrian had discretion as to whether to remand for such a review from the State agency.  That said, because the ALJ's exercise of her discretion was presumably influenced by the Record before her, the SSA should reconsider whether to remand for State agency review after the SSA obtains the Care Plus records.

Once Rodgers's application moved beyond the initial State agency review stage to the ALJ hearing stage, the State agency psychological review requirement described in section 421(h)(1) of title 42 of the United States Code, which Rodgers cites, was no longer applicable.  Rather, ALJ Garrian was free to review Rodgers's mental impairment herself, which she did.

The Social Security application process begins with an initial determination by an entity such as a State agency.  See 42 U.S.C. § 421(a)(1).  At this "initial determination" stage, if evidence indicates mental impairment, then the State agency must make "every reasonable effort to ensure . . . that a qualified psychiatrist or psychologist has completed the medical portion of the case review and any applicable residual functional capacity assessment."  42 U.S.C. § 421(h)(1).  As mentioned above, Rodgers's initial applications do not appear to have alleged mental impairment.  See Tr. at 224.

18

Psychological review thus apparently did not occur at the State agency level.  See id. at 17.  After the State agency denied Rodgers's initial application, however, Rodgers submitted an appeal form, which noted memory loss, difficulty thinking, mental health treatment, and a bipolar disorder prescription.  See id. at 259, 261–62.

The next relevant stage of the Social Security application process is that a dissatisfied claimant may request and receive an ALJ hearing.  See 42 U.S.C. § 421(d).  Rodgers requested such a hearing.  See Tr. at 9.  At the hearing stage, the ALJ performs the mental impairment evaluation technique.  See 20 C.F.R. §§ 404.1520a(a),(e), 416.920a(a),(e).

While regulations allow the ALJ to return the case to the State agency for a psychological review in a situation such as Rodgers's, regulations do not require the ALJ to return the case:  Sections 404.1520a(e)(5) and 416.920a(e)(5) of title 20 of the Code of Federal Regulations state that, if the ALJ "requires the services of a medical expert to assist in applying the [mental impairment evaluation] technique but such services are unavailable, the administrative law judge may return the case to the State agency . . . for completion of the standard document."  20 C.F.R. §§ 404.1520a(e)(5), 416.920a(e)(5) (emphasis added).  The regulations thus imply that, alternatively, the ALJ may apply the mental impairment evaluation technique without State agency assistance.  Section 416.1441(a) of title 20 of the Code of Federal Regulations similarly states that, when a claimant requests a hearing, "we may, for the purposes of a prehearing case review, forward the case to the component of our office (including a State agency) that issued the determination being reviewed."  20 C.F.R. § 416.1441(a) (emphasis added).  ALJ Garrian was thus not required to remand to the State agency.

19

Because remand to the State agency is permissible, however, the SSA should reconsider whether to remand once the SSA has obtained Rodgers's complete medical records.

As discussed above, the section 421(h)(1) psychological review requirement, which Rodgers cites to argue that the ALJ should have remanded for State case review, mentions a psychologist or psychiatrist completing "any applicable residual functional capacity assessment."  Here, ALJ Garrian has completed Rodgers's RFC assessment herself.  See Tr. at 13.  In addition to being free from any obligation to remand to the State agency, ALJ Garrian was also free from any obligation to have a psychologist or psychiatrist complete the RFC for her.  Rather, ALJ Garrian was free to complete the RFC herself, as she did.  This is because section 421(h)(1) either is inapplicable at the ALJ hearing stage, or else has an altered meaning at the ALJ hearing stage.  On its face, section 421(h)(1) appears inapplicable to the ALJ hearing stage:  First, section 421(h)(1) refers only to the "initial determination," see 42 U.S.C. § 421(h)(1), which the SSA makes before the claimant even has the option of requesting an ALJ hearing.  Second, while section 421(h)(1) references multiple other subsections of section 421, it does not reference subsection 421(d).  See 42 U.S.C. § 421(h)(1) (referring to "subsection (a), (c), (g), or (i)").  Subsection 421(d) is about ALJ hearings.  See 42 U.S.C. § 421(d) ("Hearings and judicial review").  Thus the plain text of section 421(h)(1) appears inapplicable ALJ hearings.  That said, in an unreported case, a court in this Circuit applied section 421(h)(1) to the ALJ hearing level.  However, the court interpreted section 421(h)(1) to mean only that an ALJ must consider a psychologist or psychiatrist's opinion, rather than that the ALJ must actually arrange for a psychologist

or psychiatrist to complete the RFC.  See Lahoz v. Astrue, No. 09-CV-4523 (JG), 2010

WL 3310266, at *6 (E.D.N.Y. Aug. 19, 2010).  The Record contains psychiatrist Dr.

Chaplin's opinion.  See Tr. at 1279–1283.  ALJ Garrian has thus fulfilled the section

421(h)(1) requirement as interpreted by Lahoz.  Lahoz did not require the ALJ to

remand to the State agency for a psychological review.  See 2010 WL 3310266, at *6.

This court notes that an SSA regulation states:

> An initial determination by a State agency . . . that you are not
> disabled (or a Social Security Administration review of a State
> agency's initial determination) . . . will be made only after
> every reasonable effort has been made to ensure that a
> qualified psychiatrist or psychologist has completed the
> medical portion of the case review and any applicable residual
> functional capacity assessment.

20 C.F.R. § 404.1503(e).  At first glance, this regulation's reference to "review of a State

agency's initial determination" may misleadingly appear to apply to an ALJ hearing.

See id.  However, section 421(h)(1), which the regulation appears intended to

implement, indicates that a "review" of an initial "determination" refers to the

Commissioner's sua sponte review of at least half of all initial determinations, see 42

U.S.C. § 421(c) (describing determination review), which is distinct from a claimant-

requested ALJ hearing, see 42 U.S.C. § 421(d) (describing a hearing).  Like section

421(h)(1), this regulation thus also appears inapplicable to an ALJ.  That said, in an

unreported case, a court in this Circuit has applied this regulation to the ALJ hearing

level.  However, the court interpreted the regulation to mean only that the ALJ should

obtain a consultative examination, rather than that the ALJ should arrange for a

psychologist or psychiatrist to complete the RFC.  See Clawson v. Astrue, No. 10-CV-

377 (LEK/VEB), 2011 WL 4055403, at *6 (N.D.N.Y. July 27, 2011), report and

recommendation adopted, No. 6:10-CV-0377 (LEK/VEB), 2011 WL 4055379 (N.D.N.Y.

Sept. 12, 2011).  Another court in this Circuit has similarly implied that the regulation

could apply at the ALJ hearing level, but declined to actually apply the regulation due to

the facts of the case.  See Pascual v. Sullivan, 715 F. Supp. 1268, 1271 (S.D.N.Y.

1989).

This court holds that, at the hearing level, the ALJ may perform the mental

impairment evaluation technique herself and need not arrange for a psychologist or

psychiatrist to complete the evaluation for her.  There was thus no basis to require ALJ

Garrian to arrange for a State case review.  However, given that the case is remanded,

the SSA should reconsider whether to arrange for State case review, once the SSA has

obtained the Care Plus records.

### 4.        Consultative Examination

ALJ Garrian's finding of little documented mental health treatment before 2013

also leads Rodgers to argue that, "[i]f the ALJ did not feel that the record was

adequately developed to assess the functional effects of mental impairments, a

consultative examination should have been ordered."  See Pl.'s Mem. at 4.  The ALJ,

however, has not indicated that she considered the Record inadequately developed.

See, e.g., Tr. at 15 ("The evidence of record contains sufficient evidence to evaluate the

claimant's impairments.").  Rather, ALJ Garrian appears to have mentioned her

disputed finding of little documented mental health treatment as evidence that Rodgers

did not have serious mental health problems.  See Tr. at 15–16 (containing finding in

paragraph that argues evidence does not support disabling symptoms).  The Social

Security regulations state only that, "[i]f we cannot get the information we need from

22

your medical sources, we may decide to purchase a consultative examination." 20 C.F.R. § 404.1519a(a). The regulations do not require the ALJ to obtain a consultative examination when the ALJ feels that the evidence is sufficient without such an examination. "The ALJ has discretion on a case-by-case basis to determine whether a consultative examination is needed, and is only required to order such an examination where the examination is necessary to resolve a conflict or ambiguity in the record." Phelps v. Colvin, 20 F. Supp. 3d 392, 401 (W.D.N.Y. 2014) (finding that a consultative examination was not necessary). Here, ALJ Garrian was not obligated to obtain a consultative examination. Because the ALJ's exercise of her discretion as to whether to obtain a consultative examination depended on her finding of little documented mental health treatment before 2013, the SSA should reconsider whether to obtain a consultative examination once the SSA has Rodgers's Care Plus records.

> B.          Weighing of Dr. Chaplin Opinion

Rodgers also argues that the ALJ erred by giving too little weight to Rodgers's treating physician opinion, the Dr. Chaplin Opinion. Pl.'s Mem. at 5. ALJ Garrian "gave little weight to this opinion," because she found that the limitations it described were "not supported by the overall weight of the evidence of record." Tr. at 16.

SSA regulations give the opinions of treating physicians "controlling weight," so long as those opinions are "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [are] not inconsistent with the other substantial evidence in . . . [the] record." 20 C.F.R. § 416.927(c)(2); see also Lesterhuis, 805 F.3d at 88. In other words, "the SSA recognizes a 'treating physician' rule of deference to the views of the physician who has engaged in the primary treatment of the claimant."

Burgess v. Astrue, 537 F.3d 117, 128 (2d Cir. 2008) (quoting Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003)).

Because the weighing of the Dr. Chaplin Opinion depended on the totality of evidence in the Record, and because the court remands for further development of said Record, the court need not address the weight afforded the Dr. Chaplin Opinion at this point.  The court notes, however, that the ALJ's reasoning suggests she may have applied an insufficiently deferential standard to the Dr. Chaplin Opinion.  ALJ Garrian declines to give the Opinion controlling weight, but states neither (a) that Dr. Chaplin failed to use medically accepted diagnostic techniques to support her Opinion nor (b) that the Opinion was affirmatively inconsistent with other evidence.  See Tr. at 16.  ALJ Garrian's explanation that the Dr. Chaplin Opinion was "not supported by the overall weight of the evidence" falls short of stating that the Opinion was not supported by a valid diagnostic technique, or was inconsistent with other evidence.  See id. at 16.

## VI.    CONCLUSION

For the foregoing reasons, Rodgers's Motion to Reverse the Decision of the Commissioner (Doc. No. 22) is **GRANTED**.  Colvin's Motion to Affirm the Decision of the Commissioner (Doc. No. 23) is **DENIED**.  The case is remanded to the agency for further proceedings in which the ALJ develops the Record, weighs the evidence, and issues a new decision.

**SO ORDERED.**

Dated this 17th day of August, 2016, at New Haven, Connecticut.

/s/ Janet C. Hall
Janet C. Hall
United States District Judge